UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 1:06-CR-00394 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE ANN ALDRICH |
| | ) | |
| ANTON ZGOZNIK, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | <u>MEMORANDUM AND ORDER</u> |
| | ) | |
| | ) | |

Before the court is defendant Anton Zgoznik's motion for judgment of acquittal and new trial [dkt. no. 147] and his supplemental motion for a new trial [dkt. no. 236]. For the following reasons, the motions are denied.

I.    **BACKGROUND**

On August 16, 2006, Anton Zgoznik and co-defendant Joseph H. Smith were indicted for an alleged kickback scheme that arose out of the dealings between Zgoznik's accounting, tax, and information technology companies and Smith, the CFO and Financial and Legal Secretary of the Catholic Diocese of Cleveland [dkt. no. 1]. Zgoznik was charged with fifteen counts: one count of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1349; eight counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; one count of conspiracy to defraud the IRS in violation of 18 U.S.C. § 371; one count of corruptly endeavoring to obstruct and impede "the due administration of the internal revenue laws" in violation of 26 U.S.C. § 7212(a); one count of aiding and assisting the

preparation of a false document in violation of 26 U.S.C. § 7206(2); and three counts of aiding and assisting the preparation of a false return in violation of 26 U.S.C. § 7206(2).

The court granted Smith's motion to sever the defendants because the government's intended use of a recorded conversation between Zgoznik and government witness Zrino Jukic would violate Smith's rights under the confrontation clause of the Sixth Amendment [dkt. no. 100]; the court respected the government's right to decide who would be tried first, and ordered Zgoznik's trial to proceed on August 23, 2007. At both the close of the government's case and after the defendant rested, Zgoznik moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. In each instance, the court denied the motions as to all counts. The trial concluded on September 28, 2007 and the jury was charged. On October 2, 2007, the jury returned a verdict of guilty on all fifteen counts.

On October 9, 2007, Zgoznik filed a motion for a judgment of acquittal and a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33 by incorporating by reference all prior "objections and motions made by defendant and dismissed or overruled during trial" [dkt. no. 147]. The government filed its response in opposition on October 17, 2007 and – having no new arguments to respond to – incorporated and relied upon its prior responses to Zgoznik's motions [dkt. no. 164]. The court withheld its ruling on Zgoznik's motion until the conclusion of Smith's trial.

The trial of Smith began on May 15, 2008 and continued until the jury was charged on June 20, 2008.[1]  On July 2, 2008, the jury returned a verdict of not guilty on counts one through nine (the same

---

[1] Smith was indicted on 23 counts: one count of conspiracy to commit mail fraud in violation of 18 U.S.C. §§ 371 and 1349; eight counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; eight counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i); one count of conspiracy to defraud the IRS in violation of 18 U.S.C. §371; four counts of making a false return in violation of 26 U.S.C. § 7201(1); and one count of corruptly endeavoring to obstruct and impede "the due administration of the internal revenue laws" in violation of 26 U.S.C. § 7212(a). The court granted Smith's motion to dismiss the money laundering counts 10 through 17.

mail fraud counts of which Zgoznik was found guilty) and guilty on counts eighteen through twenty-three.[2]

On September 2, 2008, Zgozniks's attorneys filed a motion to withdraw from the case; the court granted the motion and also granted Zgoznik's motion to have the Office of the Federal Public Defender provide representation.  Zgoznik's new counsel moved the court to withhold its ruling on the motion for a new trial so that counsel could have the opportunity to review the extensive record and file a supplemental motion for a new trial [dkt. no. 224].  Zgoznik asserted that the supplemental motion would "rest in large part on information disclosed after" his trial [dkt. no. 224, at 2].  The government objected on the grounds that Zgoznik was time barred from filing post-conviction motions under Federal Rules of Criminal Procedure Rule 29 and 33 [dkt. no. 226].  Because Zgoznik was not entirely time barred, the court granted his motion to file a supplemental motion, at which time the government could renew its objections [dkt. no. 228].

On January 22, 2009, Zgoznik filed a supplemental motion for a new trial [dkt. no. 236].  The government filed its response in opposition [dkt. no. 246] and Zgoznik filed his reply in support [dkt. no. 249].

## II.    DISCUSSION

### 1.  Motion for New Trial

Zgoznik's motion for a new trial [dkt. no. 147] is based on all of his  prior objections and motions made and dismissed or overruled during trial.  Zgoznik's supplemental motion for a new trial, however, is more specific.  He asks this court to grant a new trial for four reasons, viewed individually or cumulatively:  1) "newly discovered evidence" shows that government witness, Zrino Jukic,

---

[2] While the evidence and testimony in the Zgoznik and Smith trials were similar, the supplemental motion for a new trial at issue here is based, in part, on testimony from the second trial.

"repeatedly gave false testimony about his past and current tax crimes;" 2) the government failed to disclose copies of Jukic's tax transcripts in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); 3) IRS Agent James Fisher was improperly permitted to "invade the province of the jury and the Court by opining on ultimate factual and legal issues;" and 4) juror misconduct "created a negative atmosphere surrounding any attempt to question the credibility or integrity of the clergy" [dkt. no. 236, at 1-2].

Federal Rule of Criminal Procedure 33 provides the initial framework in analyzing a motion for a new trial:

> (a) Defendant's Motion.  Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires. If the case was tried without a jury, the court may take additional testimony and enter a new judgment.
> (b) Time to File.
> (1) Newly Discovered Evidence.  Any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty.  If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case.
> (2) Other Grounds.  Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty.

While the time limitations set forth in Rule 33 are no longer classified as jurisdictional, they remain "rigid" claim processing rules. *Eberhart v. United States*, 546 U.S. 12, 16 (2005).  The practical consequence of *Eberhart* is that the government may waive or forfeit its objection to the untimeliness of the defendant's supplemental motion.  *Id.* at 15.  Here, the government has objected to the timeliness of Zgoznik's supplemental motion for new trial [dkt. no. 246, at 2].

Rule 33 also requires that any arguments raised in the supplemental motion must truly supplement – that is, relate back – to the issues raised in the original motion or be based on newly

-4-

discovered evidence.  Therefore, the court must carefully examine supplemental motions to ensure that they are not used to circumnavigate the time limitations of Rule 33.

In *United States v. Villalpando*, 259 F.3d 934, 938 (8th Cir. 2001), the "district court did not rule on the original timely-filed motion [for a new trial] and no extension of time was granted within the seven day-period allowed by [Rule 33]."  However, the district court subsequently appointed new counsel and "requested supplementation of the timely filed motion."  The supplemental motion "merely specified another instance" of a claim "previously timely raised."  The court concluded that a "reasonable construction of the circumstances surrounding the motion for a new trial and its supplement is warranted and that the district court had jurisdiction to consider matters raised in the supplemental motion."

Here, under the circumstances, this court similarly concludes that, while Rule 33 is a claim processing rule and no long considered jurisdictional, the supplemental motion is not necessarily barred by the claim processing rule.

### A.  Newly Discovered Evidence

Zgoznik's supplemental motion for a new trial argues, *inter alia*, that "Zrino Jukic repeatedly gave false testimony about his past and current tax crimes" which the "government knew or should have known . . . was false in many respects, but the government failed to correct the record." [dkt. no. 236, at 1].  Zgoznik also argues that the government's failure to produce copies of Jukic's tax transcripts for certain years constituted a *Brady* violation.  *Id.* As evidence of these claims, Zgoznik points to differences in Jukic's trial testimony during Smith's trial and to the tax transcripts for the years 1998 through 2005, which were released during Smith's trial by order of this court [dkt. no. 195].  Zgoznik frames this evidence as newly discovered.

Motions for a new trial based on newly discovered evidence are viewed with great caution.  For the court to grant a new trial on these grounds, the defendant bears the burden of establishing that: (1) the evidence was discovered after trial; (2) the evidence could not have been discovered earlier with due diligence; (3) the evidence is material and not merely cumulative or impeaching; and (4) the evidence would likely produce an acquittal if the case was retried.  *United States v. Kenny*, 505 F.3d 458, 462 (6th Cir. 2007).

Claims of newly discovered evidence involving false testimony or the government's nondisclosure of evidence are each reviewed under slightly different standards.  However, each of these standards requires some showing of prejudice or various probabilities of a different outcome.

### i.  Nondisclosure of Evidence – *Brady* violations

Newly discovered evidence based on the government's nondisclosure of evidence is analyzed under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. In *Brady*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Id.* at 87.  The duty to disclose was expanded in *Strickler v. Greene*, 527 U.S. 263, 280 (1999), to include "impeachment evidence as well as exculpatory evidence" even where "there has been no request by the accused."  *Id.* (citations omitted).  The "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Id.*  To determine whether a "*Brady* violation" has occurred, the courts must determine whether (1) the evidence at issues is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence has been suppressed by the government; and (3) prejudice ensued.  *Id.* at 281-282.

Here, the court finds no adequate grounds on which to grant Zgoznik's motion for a new trial. Zgoznik's reply brief blunts much of his own supplemental motion: "[I]t appears that while the Juckic Tax Transcripts were not disclosed before or during the Zgoznik trial, the *relevant information in those Tax Transcripts for the years up to 2000 had been disclosed*, in other forms, to the Zgoznik trial team. Moreover, it appears that the Zgoznik trial team's discovery requests with regard to Jukic's tax returns pertained to the years leading up to 2000, not the period after 2000."  [dkt. no. 249, at 2, emphasis added].  Though the information in Jukic's tax transcripts was disclosed, the actual tax transcripts were not turned over because the court denied Zgoznik's motion to compel [dkt. no. 113, at 2].  Because Zgoznik had the relevant information, albeit in other forms, there was no suppression or prejudice, and therefore, no *Brady* violation occurred with respect to the tax transcripts prior to 2000.

Similarly, Zgoznik argues that the government had a "duty under *Brady* to disclose exculpatory information relating to post-2000 tax problems by Mr. Jukic."  [dkt. no. 249, at 2].  However, the jury heard testimony that Jukic still needed to file tax returns for the years after 2000.[3]  In addition, the prosecution did not have the tax transcripts of Jukic for 2003 through 2005.  Those tax transcripts could only be turned over by court order.  On motion of Smith's counsel, the court ordered the tax transcripts be produced for the years 1995 through 2005 [dkt. no. 195].[4]  Because the government has not suppressed any evidence of Jukic's tax history, no *Brady* violation occurred regarding these later tax returns.

### ii.  False Testimony

Claims of newly discovered evidence involving false testimony must establish "that the Government's case included false testimony and the prosecution knew or should have known of the

---

[3] *See infra*, discussion on false testimony.
[4] Zgoznik's counsel did not request Jukic's tax returns for the years after 2000.  *See, e.g.*, dkt. 249, at 2.

falsehood" and a "reasonable likelihood that the false testimony would have affected the judgment of the jury." *United States v. Stoddard*, 875 F.2d 1233, 1237 (6th Cir. 1989) (quoting *United States v. Antone*, 606 F.2d 566, 569 (5th Cir. 1979)).[5]

     For the reasons that follow, the court is unable to find that Jukic gave false testimony that the government knew or should have known was false, or that the testimony affected the judgment of the jury. The alleged false testimony goes towards Jukic's credibility, his motive to lie, and his motive to aid the government's prosecution of Zgoznik and Smith.

     First, Zgoznik argues that Jukic "repeatedly denied failing to file returns earlier than 1998, such as in 1997 or 1996" [dkt. no. 236, at 8].  Zgoznik cites the following exchange between his trial counsel and Jukic as evidence of Jukic's false testimony:

> Q: Now, during the course of that, [the IRS Agent] asked you also whether or not you had filed your own personal tax returns for approximately five years. Isn't that correct?
> A: No. She had told me that I had not filed my personal tax returns, and it wasn't for five years.
> Q: How many years was it?
> A: The returns that were not filed –
> Q: Your personal tax returns –
> A: I was going to say, the returns that were not filed in 1998, 1999 and then ultimately when this -- when I received notification of this audit, I was obviously a little nervous, and I did not file 2000. But ultimately everything was caught up, 2001, 2002 were all caught up.

---

[5] The *Larrison* test is used where a motion for a new trial is based on a material government witness's recantation of his trial testimony.  The motion should be granted only when (1) the court is reasonably well satisfied that the trial testimony given by the material witness is false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise when the false testimony was given, and was unable to meet it or did not know of its falsity until after trial.  *See United States v. Willis*, 257 F.3d 636, 642 (6th Cir. 2001) (citing *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928)).  Here, however, there is no indication that Jukic has recanted his trial testimony, or even that his trial testimony was false.  The *Larrison* analysis is simply another instance where prejudice or probability of a different outcome must be shown.

> Q: What about 1997? She told you hadn't filed for 1997 also,
> didn't she?
> A: I don't recall that.
> Q: All right.  So as far as you are concerned, the agent told you
> they had no record of your filing for '97, '98, '99, and 2000?
> A: Not '97. '98, '99, and 2000.
> Q: Didn't she tell you on July 29th that you were delinquent in filing your taxes for
> the year 1997?
> A: I don't recall, but if that's what you are saying – I don't recall.
> Q: All right.  Now, when you told her, "Oh, yes, I filed those," didn't you?
> A: I don't recall saying that.  I recall not – if you told me that she didn't have a record
> of it, then I recall saying I would get those to her.
> Q: Did you not tell her on two occasions to look again in the IRS records because you
> had filed those returns?
> A: I don't recall that, no.
> Q: Are you saying you never told her that?
> A: I don't recall.
>
> [Tr. 823/07, at 475-476]

Zgoznik's trial counsel continued with Jukic:

> Q: All right.  When did you finally file those returns?
> A: '98, '99 those years and 2000 were filed in the summer of 2002.
>
> [Tr., 8/23/07, at 478]

Again, similar questions from Zgoznik's counsel:

> Q: And that's what – five years late on a couple of them?
> A: No.
> Q: '97 and '98?
> A: '98 was due in 1999, and so 2000, 2001, 2002, three years later on the oldest
> return.
> Q: What about '97?
> A: I don't recall when I filed that. I just know that I recently saw records of what I
> filed, and '98 was one that was filed in the summer of 2002.
>
> [Tr., 8/23/07, at 479]

Jukic testified that he did not recall whether the IRS Agent told him he had not filed, or when he filed,

his 1997 tax return.  Jukic was not specifically asked about 1996, and his faulty memory with regard to

1997 did not impede Zgoznik's counsel from revealing that he was delinquent in filing his 1997 taxes.

As Zgoznik admitted in his reply brief, he had received the relevant information in Jukic's tax transcripts

for the years prior to 2000.  That information allowed Zgoznik's counsel to elicit testimony from Agent

Yung that Jukic had not filed a return for the years 1996 through 1999.[6]  In addition, the government

elicited similar testimony from Agent Yung that Jukic had failed to timely file returns for 1996 through

1999.[7]  While Jukic was less than forthcoming, at best forgetful, regarding his tax history, the court

cannot conclude that his testimony was false.  Nonetheless, a jury could view Jukic's forgetfulness or

lack of forthrightness about his tax problems as additional discrediting evidence.

Next, Zgoznik argues that Jukic falsely testified that, "ultimately everything was caught up,

2001, 2002 were all caught up," during the IRS audit in 2000-2002 [dkt. no. 236, at 11, *quoting* Tr.,

8/23/07, at 475].  Zgoznik claims this testimony was false because "[a]t the time Mr. Jukic offered this

testimony, in August 2007, he had still not filed any return for 2001.  He was not 'all caught up' with

---

[6] Tr., 9/25/07, at 14-15.
The following exchange was between Zgoznik's counsel and Agent Yung:
>    Q: Mrs. Yung, I am going to hand you what has been marked for purposes of identification as
>    Defendant's Exhibit Y20-9 and Y20-10. Can you identify those?
>    A: That's what we call IDR [Information Document Request] No. 7
>    Q: And would you look at your request for documents No. 7?
>    A: Okay.
>    Q: And at the top there is a request concerning Mr. Jukic's personal tax returns?
>    A: That's correct.
>    Q: And what's the comment you make in making that request, that IRS record indicate he has
>    not filed a return since 1995. Is that correct?
>    A: That is correct.

[7] *Id.* at 31-32.
On cross-examination of Agent Yung, the government elicited the following:
>    Q: And, in fact, when you started out in the year 2000 to clarify can [sic] a minor point that was
>    in the 2000 year, so Mr. Jukic's 2000 year return was not due then. Is that right?
>    A: That's correct.
>    Q: So it would be a four years of returns you indicated, 1996 through 1999 that he had not filed?
>    A: That he did not file, yeah.

the IRS by the end of the IRS Audit in 2000-2002." In 2002, Jukic was caught up with his tax returns from 1996 through 2000 and his 2001 return was granted an extension through October 15th. At trial in 2007, Jukic admitted that he had not filed his 2001 tax return after the extension expired, had not filed his 2005 tax return, and had possibly failed to file other years' tax returns. The government elicited testimony from Jukic to clarify the record:

> Q: Is there a return other than the one – yesterday you indicated that you had
> provided returns during the audit. Is that right?
> A: Yes.
> Q: And there was one that you realized you had not?
> A: I realized a couple days ago I had not.
> Q. For what year?
> A: I believe 2001.
> Q: Is there any other return that is due from you that hasn't been filed?
> A: Yes.
> Q: What year is that?
> A: I don't exactly recall, but there are a couple since then that still need to be filed.
> Q: Do you recall if you filed your 2005 return?
> A: No. I did not file that one.
>
> [Tr., 8/23/07, at 469-470]

Far from concealing that Jukic failed to file his 2001 tax return after the extension of time, the government elicited testimony from Jukic that revealed his failure to file a 2001 tax return. Therefore, the court cannot find that Jukic's testimony with regard his 2001 tax return was false. Similarly, Jukic admitted that he may have owed taxes for additional years following 2002.

Zgoznik also argues that Jukic falsely testified "about whether any returns were outstanding in 2004 when he chose to cooperate with the prosecution, and minimize his current tax problems." [dkt. no. 236, at 12] The testimony Zgoznik cites, however, does not support this assertion. Zgoznik's counsel elicited the following testimony from Jukic:

> Q: During early 2004, specifically January 2004, about the time you decided to tape

record a conversation with Mr. Anton Zgoznik, were you concerned about being
prosecuted for failing to file tax returns on time?

A: Absolutely not.

Q: You saw nothing wrong with not filing your personal returns, some of them for
two years, others three, another four and one five?

A: In 2004 –

Government: I object to the multiple question and the lack of foundation of five
years.

A: In 2004 –

Government: I am objecting to the form of the question.

The Court: The question is: Was he concerned by January of 2004?

A: Okay. In 2004 –

Q: In January 2004, were you at all concerned about the fact you had been – you had
not filed your returns on time?

A: In 2004, at that point in time, January, I was not concerned. That was not even a
consideration in my mind.  Why?  Because –

Q: I didn't ask you why, sir.

A: Because those returns –

Q: I didn't ask you why; I just asked you if you were concerned.

The Court: He said he was not concerned. Would you move on to the next question,
please?

[Tr., 8/23/07, at 481-482]

Zgoznik argues that, "at the time he was testifying against Mr. Zgoznik, Mr. Jukic still had not filed his

2001 return" and "Mr. Jukic also failed to file his 2003 tax return until July 2007."  This is salient

because "during the fall of 2004, when [Jukic] chose to cooperate with federal prosecutors, Mr. Jukic

had his 2001 and 2003 tax returns hanging over his head."  [dkt. no. 236, at 13].  However, Jukic did

not falsely state that he filed his 2004 tax return, and he was never allowed to elaborate on why he was

not concerned about his 2004 tax return.  Zgoznik already had established that Jukic had not filed his

2001, 2005, and possibly other years' tax returns at the time of his trial.  The fact that Jukic had also

failed to timely file his 2003 and 2004 tax returns is cumulative impeaching evidence that could not

reasonably affect a jury's decision, under these circumstances.  Furthermore, Jukic's tax transcripts for

years after 2002 were not available to the prosecution or Zgoznik at the time of his trial.

In sum, Jukic did not give false testimony regarding his tax history; at worst, his testimony was less than forthright, but was clarified to the jury by both the defense and the government.  The jury heard testimony that: Jukic filed his 1996 through 1999 tax returns as late as 2002; at the time he was testifying in August 2007, he still had not paid his 2001 and 2005 tax returns; and he possibly owed tax for other years after 2002.  The jury did not definitely learn, however, that in 2004, Jukic still owed taxes for 2003, but had paid them by the time of his testimony in August 2007.

### iii.  Prejudice or Probability of a Different Outcome

The cumulative weight of Jukic's alleged false testimony and the alleged *Brady* violation [dkt. no. 236 at 7-16], even when assumed *arguendo*, does not create a reasonable possibility of a different outcome and therefore cannot justify a new trial.  The alleged newly discovered evidence goes towards the credibility of Jukic's testimony, which was thoroughly questioned throughout the trial.  Additional evidence of Jukic's failure to timely file his tax returns would have been cumulative and would have only further impeached Jukic's already discredited testimony.  In light of the large volume of evidence presented during the month long trial, and that Zgoznik's counsel demonstrated Jukic's propensity and motive to lie, there is little possibility that the additional evidence, used solely to further impeach Jukic, would result in a different outcome.

Zgoznik asserts that Jukic's "different, truthful responses during the Smith trial not only 'affected' the judgment of that jury, but evidently led the jury to acquit Mr. Smith of the main charges related to the alleged 'kickbacks.'"  This assumption is unfounded and misplaced.  First, this court has addressed Zgoznik's claims that Jukic gave false testimony.  Second, there were substantial differences between the Zgoznik and Smith trials.  Two of the most notable differences were the taped conversation between Zgoznik and Jukic where Zgoznik discusses the authorized compensation defense and

Zgoznik's own testimony at trial.  Therefore, the court cannot share Zgoznik's assumption as to the cause of the different outcome for his co-defendant.

### D.  Testimony of Agent Fisher

Zgoznik argues that IRS Agent James Fisher was "improperly permitted to (1) invade the province of the jury by evaluating the trial testimony (including making credibility determinations) and opining on ultimate factual issues, and (2) invade the province of the Court by opining on legal issues." [dkt. no. 236, at 16].

Supplemental motions for a new trial must relate back to claims made in a timely filed motion. *See supra*.  "Additional grounds raised in amendments, supplements or renewals of a timely motion for new trial are procedurally barred if not asserted within the seven-day time limit unless the district court grants an extension before the original seven-day period has expired."  *United States v. Villalpando*, 259 F.3d 934, 937 (8th Cir. 2001).

Because Agent Fisher's testimony was not a subject of the original timely filed motion for a new trial, this claim is an additional ground not asserted within the seven-day time limit.  Therefore, this claim is untimely and may not be considered here.

### E.  Jury Misconduct

Zgoznik argues that juror misconduct, when combined with the above claims, undermines the fairness and integrity of his trial [dkt. no. 236, at 20-22].  This claim was raised in the original timely filed motion for a new trial and is therefore supplemental to the original.  By incorporation, Zgoznik seeks a new trial based on the arguments raised in a separate motion for mistrial [dkt. no. 131], and on the oral motions made in chambers [*See* Tr., 8/30/07, at 644-654; 9/5/07, at 785-813].  Specifically, Zgoznik raises three related arguments in his formal motion for mistrial, which capture the essence of

the arguments made orally and in the supplemental motion for a new trial.  First, "there is a bias on the jury, particularly with Juror No. 13, in favor of treating witnesses who are members of the clergy preferentially."  [dkt. no. 131, at 5].  Second, "contrary to the Court's instruction, the jurors have clearly begun to deliberate by expressing a collective opinion regarding the credibility of witnesses and by "taking sides" in a dispute among jurors.  *Id*. at 5-6.  And finally, "this premature deliberation has and will fix and solidify the positions of the jurors prior to the completion of the evidence."  *Id*. at 6.

For the reasons that follow and those already on the record, the court again denies the motion.

In all criminal cases, the Sixth Amendment guarantees the right to a trial "by an impartial jury." U.S. CONST. amend. VI.  Impartiality is presumed "so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case."  *Lockhart v. McCree*, 476 U.S. 162, 184 (1986); *see also United States v. Pennell*, 737 F.2d 521 (6th Cir. 1984) (holding that "[p]rejudice is not to be presumed.").  The burden of proof rests with the defendant to establish that the jury misconduct "resulted in actual juror partiality."  *Pennell*, 737 F.2d at 532.

In cases of jury misconduct, the court must first distinguish between misconduct that is internal to the jury and that which arises from external influences.  *Tanner v. United States*, 483 U.S. 107, 117-18 (1987).  While external influences pose a "far more serious threat to the defendant's right to be tried by an impartial jury," *Resko*, 3 F.3d at 690, internal jury misconduct also threatens the defendant's rights and "cannot be ignored."  *United States v. Gianakos*, 415 F.3d 912, 921 (8th Cir. 2005).

To protect the defendant's Sixth Amendment right to a fair trial, judges have "firmly established" a practice of admonishing juries at the "outset of trial not to discuss the case with anyone," including among themselves, before the conclusion of the trial.  *United States v. Resko*, 3 F.3d 684. 689 (3rd Cir. 1993).  There are many reasons for the court to prohibit the jurors from premature deliberations.  First,

-15-

premature deliberations are likely to favor the prosecution because its evidence is presented before the defendant has an opportunity to present evidence, and may, in effect, shift the burden of proof from the government to the defendant who would have "the burden of changing by evidence the opinion thus formed." *Resko*, 3 F.3d at 689 (*quoting Winebrenner v. United States*, 147 F.2d 322, 328 (8th Cir. 1945)). Conversely, prohibiting premature deliberations protects the defendant's right to have the government prove its case beyond a reasonable doubt. *Id.* Second, "once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion." *Id.* Third, a jury's decision-making process is intended to be collective and deliberative; premature deliberations among individual jurors "may thwart that goal." *Id.* Finally, any premature deliberations are necessarily done without the court's instructions on the law or the reasonable doubt standard. *Id.*

Where a jury does not adhere to the court's admonishment against premature deliberations, "the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." *Resko*, 3 F.3d at 690 (emphasis original).

It is well-established that district courts have broad discretion in resolving claims of juror misconduct, including "considerable discretion in determining the amount of inquiry necessary, if any, in response to allegations of jury misconduct." *United States v. Logan*, 250 F.3d 350, 378 (6th Cir. 2001); *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000) (noting that "a trial judge is vested with broad discretion in responding to an allegation of jury misconduct, and that discretion is at its broadest when the allegation involves internal misconduct . . . Such as premature deliberations. . . .").

-16-

In *United States v. Gaitan-Acevedo*, 148 F.3d 577, 590 (6th Cir. 1998), the government informed the court that it overheard "the jurors discussing the case and commenting on the credibility of witnesses and guilt of defendants" prior to the close of evidence and the court's instructions. The court "conducted a voir dire of the 16 jurors and discharged the juror that made disparaging comments, and gave the remaining jurors a series of cautionary instructions." There, the jurors "joked about 'convict[ing] them all' so that they could go home." *Id.* Nonetheless, the appellate court did not find these comments evidence of actual bias and held that the district court undertook the appropriate steps in determining the existence of possible prejudice.

Here, the misconduct is internal to the jury and arises from a dispute between jurors over the propriety of questions asked of Financial Advisory Council member William Reidy and Bishop Pilla.[8] Juror #3 drafted the question to both witnesses inquiring whether they "were ever at the condo in Florida."[9] [Tr., 8/30/07, at 502]. These questions upset juror #13, and upon returning to the jury room, loudly said "that is a dumb question. Don't ask that." This exchange led juror #3 to write the following letter to the court, which was read into the record in chambers before counsel:

> Yesterday, I submitted several questions to the Judge of both witnesses. One specific question was asked by the Judge of both witnesses. There was a reason I submitted the question to the Judge of the first witness and a reason I thought to ask it of the second.
> On a break in the jury room while I was thinking about this question and verbally putting the question together in my head and the reasons for it, someone said to me, 'That is a dumb question. Don't ask the witness that.' I did not understand. Why would they say such a thing and with such a serious tone? I thought for a moment that very easily I

---

[8] It is the practice of this court to allow jurors to submit questions, through the court, to the witnesses. *See United States v. Richardson*, 233 F.3d 1285, 1289 (11th Cir. 2000) (noting that "every circuit to consider the practice has permitted it, holding that the decision to allow juror questioning rests within the discretion of the trial judge); *see, e.g., United States v. Collins*, 226 F.3d 457 (6th Cir. 2000).

[9] The government had argued that a condominium lease was used to conceal payments to Zgoznik's co-defendant, Smith.

could explain my reasons for the question, but I did not know if I was allowed to discuss the reasons why I think this question is important, and a moment later we were called back into Court.

On the way into Court, I am wondering about her adamant comment. Is it the witness title of Bishop that makes the exact same question valid or invalid, or to use their words, dumb? I did not think it was a dumb question, first, because of the many reasons that I don't think I can talk about and, second, because the judge asked the exact same question I submitted to the previous witness. I submitted the question, and the Judge asked it of the second witness. So I guess it was not a dumb question.

As we were leaving the courtroom after testimony but before we entered the jury room, and loud enough for me and others to hear, she says, quote, 'That was a dumb question.' Closed quote. I am sure the jury clerk who was holding the door heard it, and maybe some in the courtroom. I thought she was directing the comment to me, because on a prior break in the jury room, while I was thinking and verbally putting the questions together in my head and the reasons for them, she had said to me not to ask this witness that question. It is a dumb question.

I approached the person in the jury room and said softly, 'I am sorry if I somehow offended you by submitting that question to the Judge.' Her reply was loud and scolding, caps, 'That was a dumb question.' I was stunned. I haven't had someone yell at me in 30 years, let alone a stranger in the middle of a jury room, while I am trying to apologize to someone but I don't even know what for. I think my snap response was 'What are you, my ex-wife, talking to me like that' and I left the jury room for the day.

I would like to be removed from this jury. I refuse to be ridiculed by someone on the jury who thinks my questions submitted to the Judge and read by the Judge are in her words, dumb, and has voiced it loudly. In my personal life I am not exposed to people who interact in such a fashion.

Juror No. 3

[Tr., 8/30/07, at 499-501]

After discussing the matter with counsel, the court spoke to the jurors in the jury room without counsel.

In sum, they were told that "I think that there have been some questions raised here about one instruction that I did give you, which was that you should not discuss, deliberate about this case . . . about which witnesses you believe, which ones you don't believe and so on until you have heard all of the evidence

-18-

from all of the witnesses, and there are a lot of reasons for that."  [Tr. 8/30/07, at 512-13].  The court

emphasized that this prohibition includes discussing the questions asked by other jurors, "because they

may see something that you don't see, and it may be a very important question down the road" or it

could "be a question that won't have much of any importance as you get down the road."  Such

determinations, the jurors were told, could not be made – and should not be made – until the conclusion

of all the evidence.  [Tr. 8/30/07, at 513-14].  The court concluded its remarks to the jury by reminding

them to be respectful of each other.  *Id*. at 515.

Later the same day, the court received another letter signed by eleven jurors.  This letter was also

read into the record in chambers with counsel:

> Judge Aldrich,
> Due to the meeting we had earlier today, due to yesterday's questions,
> there has been an increasing tension between Juror No. 3 and the rest of
> the jury.  Apologies have been made to him but have not resulted in a
> resolution.  Juror No. 3 is staring down No. 13 in the jury room as well
> as during the trial.  Juror No. 3 has also thrown his notepad across the
> jury room.  We, the jury, no longer feel comfortable with the situation as
> it stands with Juror No. 3.  We wanted to bring this to your attention.

[Tr. 8/30/07. At 642]

In addition, juror # 3 asked if he could be excused from the jury.  After further discussion with

counsel, the court dismissed juror #3 on the basis of his request and not because of the letter from his

fellow jurors [Tr. 8/30/07, at 654-58].  The court then entered the jury room to inform the jury that juror

#3 was excused based on his request and not because of their letter.  Again, the court asked the jurors

if they could "judge the credibility of the witnesses that you will hear using the same standards for

everybody," regardless of whether the witness is law enforcement or clergy.  No one indicated they

could not or would not follow the court's instructions.  [Tr., 8/30/07, at 660].

The following day, on Friday, August 31, 2007, Zgoznik informed the court that he would

-19-

formally move for a mistrial; the motion for mistrial was filed on Tuesday, September 4, 2007 [dkt. no. 131]. Due to the Labor Day weekend, the jurors did not return until Wednesday, September 5, 2007.

Though the court had repeatedly asked the jurors if they could judge the credibility of the witnesses regardless of their title or profession, the court undertook the additional step of conducting a voir dire of each individual juror, in chambers and with counsel present [Tr. 9/5/07, at 722-85]. Each juror was specifically asked whether he or she could be impartial in judging the credibility of witnesses. Each juror assured the court and counsel that they remained impartial in judging the credibility of witnesses. Following the voir dire, Zgoznik's counsel again moved for a mistrial, or in the alternative, to excuse juror #13.[10] The court denied the motion for mistrial [Tr. 9/5/07, at 796] but granted the motion to dismiss juror #13 because she "was the only one of the jurors that we felt had broken the rules by discussing, getting into discussion about the merits of questions before the case had been turned over to them, and they have to realize that however innocent it may be at the time, you just can't discuss aspects of the evidence, or you can't editorialize on other people's questions." [Tr. 9/5/07, at 802-03].

Zgoznik has not demonstrated that the internal jury misconduct resulted in actual juror partiality. Throughout the trial, the court maintained the practice of admonishing the jury against discussing the case, even among themselves, prior to being instructed by the court. When the court became aware that jurors had discussed the propriety of certain questions submitted by a juror, the court again instructed the jury not to discuss or form opinions about the evidence until instructed.

---

[10] "Your Honor, on behalf of the Defendant, we renew our motion for mistrial on the basis there have been deliberations within this jury about the propriety of questions asked of the Bishop, and I remain concerned that the expressions of belief about that question, about the Bishop, as the majority of the jurors are saying with respect to Juror No. 13 has tainted this jury pool and contaminated the jury. I suspect I know how the court is going to rule on that motion, and in the event it is denied, we would ask the court to excuse no. 13 on the basis that she does hold Bishop Pilla or the clergy to a different standard of credibility." [Tr., 9/5/07, at 787].

Zgoznik relies on the reasoning in *United States v. Resko*, 3 F.3d 684 (3rd Cir. 1993) in support of his motion for mistrial. That reliance in misplaced. In *Resko*, "every juror admitted to partaking in premature discussions" and "because the district court failed to engage in any investigation beyond the cursory questionnaire, there is no evidence in the record one way or the other regarding prejudice to the defendants." *Id*. at 690. Here, at most only two jurors could be said to have engaged in premature deliberations. However, the facts of this case do not even establish that juror #3 engaged in any premature deliberations. And unlike Resko, this court, with the assistance of counsel, undertook extensive steps to investigate on the record any potential prejudice towards the defendant. With the exception of juror #13, no prejudice was discovered. Accordingly, the court denies Zgoznik's motion for a new trial on the grounds of juror misconduct.

### F.  Other Grounds

As stated above, Rule 33 provides that upon the defendant's motion, the court may grant a new trial "if the interest of justice so requires." Motions for new trial are granted only in extraordinary circumstances where the evidence preponderates heavily against the jury's verdict. *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007). The court considers the credibility of the witnesses and the weight of the evidence to ensure that there is not a miscarriage of justice. *Id.*

The remaining grounds listed in the motion for a new trial are denied for the reasons previously stated in denying or overruling the original motions or objections. The court has reviewed the trial transcripts and the evidence put forth at trial. The evidence was sufficient to support the jury's verdict and there was no miscarriage of justice.

### 2. Motion for Judgment of Acquittal

Federal Rule of Criminal Procedure 29(c) provides that a defendant may make a motion for a judgment of acquittal within seven days after a guilty verdict. The court must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court must determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. Unlike a motion for new trial, under Rule 29, the court does not weight the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002).

Zgoznik previously moved for a judgment of acquittal at the close of the government's case and after the defense rested. The court denied both of the motions. Zgoznik now moves the court for judgment of acquittal following a jury verdict of guilty on all counts. The motion is based on all previous motions for acquittal and "all other objections and motions made by defendant and dismissed or overruled during trial" [dkt. no. 147].

This court has already determined that a new trial is not warranted under the broader standard of review provided by Rule 33. "*A fortiori* this court, under the much narrower standard provided by Rule 29, must conclude that a rational jury could have found that the elements of each of the offenses of conviction were proved beyond a reasonable doubt." *United States v. Jones*, 2008 WL 4831223 (E.D. Tenn., Nov. 3, 2008).

Accordingly, because the court finds that the evidence viewed in a light most favorable to the prosecution supports the jury's verdict as to all counts, and for the reasons previously stated on the record in denying prior motions for judgment of acquittal, the motion is again denied.

### III.    CONCLUSION

For the above reasons, Zgoznik's motion for judgment of acquittal and a new trial [dkt. no. 147] and supplemental motion for a new trial [dkt. no. 236] are denied.  A sentencing date will be set in a forthcoming order.

IT IS SO ORDERED.

      /s/ *Ann Aldrich*
ANN ALDRICH
UNITED STATES DISTRICT JUDGE

**Dated: April 30, 2009**